IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

SHARON L. ABBOTT,               )
                                )
            Plaintiff,          )
                                )
    v.                          )    Case No.
                                )    05-6036-CV-SJ-REL-SSA
JO ANNE BARNHART, Commissioner  )
of Social Security,             )
                                )
            Defendant.          )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Sharon Abbott seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Title
II of the Social Security Act ("the Act"). Plaintiff argues
that the ALJ failed to properly evaluate plaintiff's
credibility, and the testimony of the vocational expert is
not supported by substantial evidence in the record. I find
that the substantial evidence in the record supports the
ALJ's finding that plaintiff is not disabled. Therefore,
plaintiff's motion for summary judgment will be denied and
the decision of the Commissioner will be affirmed.

*I.    BACKGROUND*

On October 31, 2002, plaintiff applied for disability
benefits alleging that she had been disabled since June 1,
1999. Plaintiff's disability stems from fibromyalgia and

depression. Plaintiff's application was denied on February
7, 2003. On June 14, 2004, a hearing was held before an
Administrative Law Judge. On August 11, 2004, the ALJ found
that plaintiff was not under a "disability" as defined in
the Act. On February 11, 2005, the Appeals Council denied
plaintiff's request for review. Therefore, the decision of
the ALJ stands as the final decision of the Commissioner.

## II. *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides
for judicial review of a "final decision" of the
Commissioner. The standard for judicial review by the
federal district court is whether the decision of the
Commissioner was supported by substantial evidence. 42
U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401
(1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir.
2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997);
Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The
determination of whether the Commissioner's decision is
supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision. Universal Camera
Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan,
876 F.2d 666, 669 (8th Cir. 1989). "The Court must also

2

take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that

3

she is unable to return to past relevant work because of the
disability, the burden of persuasion shifts to the
Commissioner to establish that there is some other type of
substantial gainful activity in the national economy that
the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853,
857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974
(W.D. Mo. 2000).

The Social Security Administration has promulgated
detailed regulations setting out a sequential evaluation
process to determine whether a claimant is disabled.  These
regulations are codified at 20 C.F.R. §§ 404.1501, et seq.
The five-step sequential evaluation process used by the
Commissioner is outlined in 20 C.F.R. § 404.1520 and is
summarized as follows:

1.  Is the claimant performing substantial gainful
activity?

        Yes = not disabled.
        No = go to next step.

2.  Does the claimant have a severe impairment or a
combination of impairments which significantly limits her
ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

4

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff, her husband Vincent Abbott, and vocational expert George McClellan, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1970 through 2003:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1970 | $    158.24 | 1987 | $      0.00 |
| 1971 | 34.65 | 1988 | 0.00 |
| 1972 | 578.75 | 1989 | 0.00 |
| 1973 | 478.00 | 1990 | 8,111.50 |
| 1974 | 0.00 | 1991 | 15,017.93 |
| 1975 | 0.00 | 1992 | 10,863.11 |
| 1976 | 0.00 | 1993 | 10,813.56 |
| 1977 | 0.00 | 1994 | 11,199.40 |
| 1978 | 0.00 | 1995 | 14,635.24 |
| 1979 | 0.00 | 1996 | 14,834.79 |
| 1980 | 0.00 | 1997 | 17,444.72 |
| 1981 | 0.00 | 1998 | 16,839.33 |
| 1982 | 0.00 | 1999 | 6,158.51 |
| 1983 | 0.00 | 2000 | 0.00 |
| 1984 | 0.00 | 2001 | 0.00 |
| 1985 | 18.75 | 2002 | 0.00 |
| 1986 | 0.00 | 2003 | 518.00 |

(Tr. at 50).

**Disability Report Adult**

On October 3, 2002, plaintiff completed a Disability Report - Adult stating that she walks as much as possible, which is two miles some days and other days only a few blocks (Tr. at 70).

6

**B.    *SUMMARY OF MEDICAL RECORDS***

On October 28, 1998, plaintiff was seen at North Town Medical Group complaining of headache (Tr. at 165). "Basically they are bitemporal in origin.  She is going to see her dentist because of the fact that she is grinding her teeth and she had TMJ[1].  This could be related to her headaches but she also has a history of migraine headaches. She states that the Prozac since she's been on it she's gained about 20 pounds.  She wishes to go off of it because she passed the anniversary date of her mother's death as well as she is switching jobs."  Plaintiff was a healthy-appearing female in no acute distress.  The doctor prescribed Cipro, Fioricet for headache, Lorazepam for anxiety, and Imitrex for headache.

On April 20, 1999, plaintiff was seen at North Town Medical Group for a check up (Tr. at 163).  "She is about 20 pounds overweight. . . .  She does try to exercise." Plaintiff was a healthy-appearing female in no acute

_____

[1]Temporomandibular joint (TMJ) syndrome or TMJ joint disorders are medical problems related to the jaw joint. The TMJ connects the lower jaw to the skull (temporal bone) under the ear. Certain facial muscles control chewing. Problems in this area can cause head and neck pain, a jaw that is locked in position or difficult to open, problems biting, and popping sounds when biting.

Case 5:05-cv-06036-REL   Document 15   Filed 04/19/06   Page 7 of 47

distress.  Her EKG was normal.  "Highly encouraged patient
that in order to be successful in maintenance of weight loss
she needs to increase exercise."

June 1, 1999, is plaintiff's alleged onset of
disability.

On June 26, 1999, plaintiff was seen at North Town
Medical Group for headaches (Tr. at 161).  "She thinks she
is taking to many medicines.  There is [sic] a lot of new
stressors in her life, she quit her job and since she quit
her job the migraines are less frequent.  She has trouble
sleeping, there is the anniversary of her mother's death
coming up as well as her youngest daughter is moving out and
going on her own as well as she is moving out of the
northeast area and moving into a normal home in the next 3-4
months and these are a lot of changes in her life.  I did
discuss all of these with patient and told her that the
headaches are probably from the stress and I would continue
taking the Ativan until the stress gets better and then
hopefully the migraines will get better as well."  The
doctor wrote a prescription for Imitrex for headaches,
Fiorinal for headaches, and Ativan.

On July 20, 1999, plaintiff was seen at North Town
Medical Group for weight control (Tr. at 160).  "She does

exercise in the form of aerobics daily and Taebo 2-3 x's/week. Overall she's doing fine. . . . Highly advised patient that she needs to keep up the good work with increased exercise".

On September 9, 1999, plaintiff was seen at North Town Medical Group for allergy problems and she requested a referral for a colonoscopy (Tr. at 159, 160).

On September 30, 1999, plaintiff was seen at North Town Medical Group for headache (Tr. at 158). "She has a history of migraine. She was seen last night at NKC ER where they gave her a shot of Demerol and Compazine. . . . She normally takes Fiorinal for her headache and she has been out." The doctor gave her a prescription for Fiorinal.

On October 11, 1999, plaintiff had a colonoscopy performed by Steven Cicero, D.O. (Tr. at 166-167). The colonoscopy was normal, and Dr. Cicero recommended that plaintiff reduce laxatives and increase the fiber in her diet.

On October 25, 1999, plaintiff was seen at North Town Medical Group to talk about her colonoscopy (Tr. at 156, 158). "Headaches she has more frequently than not. She was on Prozac 20 mg several years ago for about 3 years in a row and she did well on this." Plaintiff was a healthy-

9

appearing female in no acute distress. Her affect was good, insight was good. The doctor assessed underlying depression, history of migraine headaches, most likely exacerbated by the depression, and fibromyalgia. Plaintiff was prescribed Fiorinal for headache, Lorazepam for anxiety, and Prozac.

On November 29, 1999, plaintiff was seen at North Town Medical Group for a follow up on depression (Tr. at 155, 156). "She gets extremely fatigued, body aches, headache severity is better, still getting headaches but not as bad. Prozac is helping some." Plaintiff was diagnosed with depression, myalgia, fatigue, and insomnia.

On December 22, 1999, plaintiff called the North Town Medical Group and complained of muscle spasms in her neck (Tr. at 155). The doctor called in a prescription for Skelaxin.

On January 12, 2000, plaintiff saw Perri Ginder, M.D., a rheumatologist (Tr. at 116-118). Portions of Dr. Ginder's report read as follows:

> HISTORY OF PRESENT ILLNESS:
> . . . Her primary complaint is chronic headaches, which she has had for 20 years now, but she has also complained of fatigue, non-restorative sleep and generalized musculoskeletal pain. . . . She has had daily musculoskeletal pain, worsening in the last 6-8 months. Her hands [are] stiff and often numb when she

gets up in the morning. She has longstanding TMJ and uses a bite block and is known to have bruxism[2]. she is not involved in any psychotherapy at the present time. Her elbows, knees and neck are her primary areas of discomfort. . . .

SOCIAL HISTORY:
She is married. She has been able to retire from work in retial [sic] sales and now baby-sits for her 1-year old grandson. She uses no alcohol or cigarettes. In the past, she taught aerobics, but she is not doing any sort of regular exercise at the present time.

* * * * *

PHYSICAL EXAMINATION:
. . . She is 5 feet, 1 inch in height and weight is 138 pounds. She is a pleasant, articulate, worried-appearing, 45-year-old. . . . Peripheral joints show no restriction of range of motion. No evidence of inflammatory synovitis. Twelve of twelve fibrositic trigger points are tender, however. Neurologic examination is intact.

* * * * *

IMPRESSION:
1.   Fibromyalgia.
2.   Chronic headaches.
3.   Irritable bowel syndrome.
4.   Temperomandibular joint syndrome.

DISCUSSION:
. . . The use of amitriptyline at h.s. [bedtime] was recommended. . . . She may use more ibuprofen, up to four tablets at a time, maximum of 16 tablets per 24 hours. . . . She understands how to resume exercise and will plan to try that on her own. If necessary, we can refer to physical therapy for support in that.

(Tr. at 116-118).

_____

[2]Gnawing or gnashing the teeth.

11

On January 27, 2000, plaintiff was seen at North Town Medical Group (Tr. at 154). She reported that a neurologist, Dr. Grinder, diagnosed plaintiff with fibromyalgia. "Overall she knows how to deal with the fibromyalgia and she is going to read on it and deal with it." Plaintiff was a healthy-appearing female in no acute distress. The doctor assessed fibromyalgia, history of migraine headaches, and stress syndrome. The doctor continued plaintiff on her medications.

On February 1, 2000, the Family Medical Group called in a refill for Fiorinal (Tr. at 154). Plaintiff called the office and stated that Dr. Grinder recommended she increase her Prozac to 40 mg. to help with fibromyalgia, so the doctor called in a refill of Prozac.

On February 24, 2000, plaintiff was seen at the North Town Medical Group asking about Prozac (Tr. at 148). "Dr. Ginder wanted her to go up on Prozac from 30 to 40. She started having side effects. She states she was crying a lot and she thought she had chronic PMS. She, herself, decreased to 20, she is feeling better. . . . Overall she is doing fine." The doctor observed plaintiff as a healthy-appearing female in no acute distress. The doctor diagnosed stress syndrome, fibromyalgia, and mild obesity. "Advised

12

to surf the net for some diet therapy for fibromyalgia because certain diets may help alleviate the symptoms."

On March 6, 2000, plaintiff called the North Town Medical Group and stated that she had read on the internet that Vioxx and Ambien can help fibromyalgia (Tr. at 148). The doctor called in prescriptions for those medications.

On June 27, 2000, plaintiff was seen at North Town Medical Group with a chief complaint of "a blah feeling, bruising all over but she takes 4-8 Advil per day and 2 Fiorinal per day. She also has a history of fibromyalgia. . . . I told her we could do work up on the bruising and she wishes to defer at this point" (Tr. at 147). Plaintiff said her Zoloft 50 mg was helping with her depression but she was still crying, so the doctor increased her dose to 100 mg. Plaintiff was noted as being a healthy-appearing female in no acute distress. The doctor diagnosed depression, fibromyalgia, and mild obesity. The doctor advised her to decrease Advil to 2-4 per day and limit the acetaminophen [Tylenol] intake to less than 4,000 mg per day. "[H]ighly encouraged to increase exercise."

On July 13, 2000, plaintiff was seen at North Town Medical Group for a well check (Tr. at 146). She stated that her fibromyalgia flares up before her menstrual cycle

13

and during the days of it. "She states that it is usually unbearable during those times." She was assessed with fibromyalgia with flare up of symptoms around menstrual cycle. The doctor prescribed Demulen, an oral contraceptive, to help with fibromyalgia.

On July 28, 2000, plaintiff was seen at North Town Medical Group for a follow up on her headaches (Tr. at 145). The doctor observed that plaintiff was a healthy-appearing female in no acute distress. The doctor diagnosed tension headache, history of fibromyalgia, and TMJ. The doctor prescribed Fioricet for her headache.

On October 10, 2000, plaintiff was seen at North Town Medical Group for head and chest congestion (Tr. at 144). She was diagnosed with acute upper respiratory, acute sinusitis, acute tracheobronchitis, and mild obesity.

On November 10, 2000, plaintiff was seen at North Town Medical Group for a follow up on her weight (Tr. at 143). "She's exercising, aerobics, 40 minutes 2 x's/week as well as yoga." The doctor assessed obesity and history of fibromyalgia. "Advised to keep up the good work with increase in exercise and decreased caloric intake. See me in 1 month."

14

On December 8, 2000, plaintiff was seen at North Town
Medical Group (Tr. at 142).  Her chief complaint was chest
pressure.  "Upon further questioning the patient does state
that she's been under a lot of pressure and stress with
family matters and she's been having some difficulty with
different things."  The doctor observed that plaintiff was a
healthy-appearing female in no acute distress.  PA and
lateral chest x-rays were negative for any active
infiltrates or acute changes.  EKG revealed a normal sinus
rhythm with no ischemic changes and no changes since her
last EKG on April 20, 1999.  The doctor assessed chest
pressure, reflux esophagitis, dysphagia, fibromyalgia,
insomnia, and stress syndrome.  The doctor increased her
Zoloft to 150 mg, added Carafate suspension, and refilled
her Ativan.

On March 22, 2001, plaintiff was seen at North Town
Medical Group for a refill on her medication (Tr. at 141).
"She is on Fiorinal plain, she takes about 3 a day for her
chronic headaches.  She also has fibromyalgia and underlying
depression secondary to fibromyalgia.  Overall she's been in
fairly good health."  The doctor observed that plaintiff was
a healthy-appearing female in no acute distress.  The doctor
assessed fibromyalgia, chronic headaches, and depression

15

secondary to fibromyalgia. The doctor refilled plaintiff's Fiorinal and Ativan and told her to come back in three months.

On June 18, 2001, plaintiff was seen at North Town Medical Group (Tr. at 140). She complained that her left hand had been hurting for three days. She had been doing a lot of gardening and moving rocks. The doctor observed a healthy-appearing female in no acute distress. An x-ray of the left hand showed no acute osseous pathology. The doctor assessed left hand pain, acute strain of the left wrist, and history of depression. The doctor prescribed Naprosyn, refilled plaintiff's Zoloft, told her to use ice for the next 48 hours, and do range of motion exercises.

On August 6, 2001, plaintiff was seen at North Town Medical Group complaining of constipation (Tr. at 139).

On October 29, 2001, plaintiff was seen at North Town Medical Group complaining of a fever for three days (Tr. at 138). The doctor noted she was in no apparent distress. The doctor diagnosed upper respiratory infection and pharyngitis and prescribed Augmentin, an antibiotic. "I would recommend her wearing a mask, washing her hands thoroughly if she is going to be handling her newborn grandson."

16

On December 17, 2001, plaintiff was seen at North Town Medical Group complaining of cold symptoms (Tr. at 136, 137, 187). "I advised her that she needs to start exercising 3-4 x's/week as well as decreasing her appetite and limit her fat intake to 60 grams of fat per day". The doctor observed that plaintiff was in no acute distress. The doctor diagnosed upper respiratory, acute tracheobronchitis, acute pharyngitis, acute sinusitis, and obesity.

On March 25, 2002, plaintiff was seen at North Town Medical Group "with a chief complaint she is here for a med check and office visit. Overall she denies any other problems. She takes about 2-3 Fiorinal per day, 6-8-10 Ibuprofen per day for fibromyalgia and Ativan 1.0 ,mg at hs [bedtime] for her insomnia" (Tr. at 135, 186). The doctor observed that plaintiff was a healthy-appearing 47 year old female in no acute distress. The doctor assessed fibromyalgia, stress syndrome, and insomnia. Plaintiff's Fiorinal and Ambien were refilled, and she was told to return in six months.

On April 1, 2002, plaintiff went to Lakewood Chiropractic (Tr. at 124-126). She stated that her 25 to 30 pound grandson fell on her lower back, and she was unable to sit or lie down (Tr. at 125-126). This occurred on March

17

26, 2002. The chiropractor found positive straight leg
raise[3], positive Goldthwait's Test[4], positive Braggard's
Test[5], positive Yeoman's Test[6], and positive Minor's Sign[7].
The chiropractor recommended chiropractic adjustments,

---

[3]With the patient seated or supine, the leg is
straightened (with ankle dorsiflexed and knee extended).
Reproduction of the radiating leg pain with the leg raised
to less than 60 degrees is considered a positive test.

[4](Straight leg raising test) Performed with the patient
lying supine, the entire lower extremity is flexed at the
hip with the knee extended and the foot held in a 90-degree
dorsiflexed position. As a result the gastrocnemius and
hamstrings are tensed and leverage is transmitted to the
side of the pelvis being tested.

[5]With the patient supine and both lower limbs straight
and parallel, the whole extremity on the affected side is
flexed on the hip until the patient experiences pain with
the lower limb held in this position the foot is strongly
dorsiflexed. The sign is present if there is an increase in
radicular pain from this action. A positive test indicates
peripheral or nerve root irritation of the sciatic nerve.

[6]With the patient prone, the examiner with one hand
exerts downward pressure over the suspected sacroiliac joint
while with the other hand the examiner maximally flexes the
ipsilateral knee and from this position hyperextends the
thigh lifting it from the table while holding down the
pelvis with the other hand. Pain deep in the sacroiliac
joint constitutes a positive test. A positive test
indicates strain of the anterior sacroiliac ligaments.

[7]The method of rising from a sitting position
characteristic of the patient with sciatica; the patient
will support himself on the healthy side placing one hand on
the back holding the affected leg and balancing on the
healthy leg.

18

Case 5:05-cv-06036-REL   Document 15   Filed 04/19/06   Page 18 of 47

diathermy[8], intersegmental traction[9], interferential electrotherapy[10], and vasopnewmatic devices.

On April 5, 2002, Doran Nicholson, plaintiff's chiropractor, reviewed x-rays of plaintiff's lumbar spine that were taken on April 1, 2002 (Tr. at 130). His impression was early lumbar spondylosis, disc wedging at L3/L4, and L4/L5, and posterior weight bearing.

On August 19, 2002, plaintiff was seen at North Town Medical Group for a check on her medication (Tr. at 134, 185). She was taking Ativan for insomnia and Fiorinal as needed for headache. "She is doing better. She goes to a chiropractor for adjustments of her low back. She denies

---

[8]Electrodes and other instruments are used to transmit electric current to surface structures, thereby increasing the local blood circulation and facilitating and accelerating the process of absorption and repair.

[9]A device that opens spinal joints and moves them lightly and comfortably. It has two purposes. It helps with blood flow and to reinforce the adjustment by creating additional movement to spinal joints. It will also "warm-up" the spine, to prepare it for the adjustment. This therapy is beneficial for patients who have a severely restricted or tight back.

[10]Interferential therapy devices use two separate electrical frequencies that work together to stimulate large impulse nerve fibers — ones that "close the gate." Their frequencies interfere with the transmission of pain messages at the spinal cord level, and help block their transmission to the brain.

Case 5:05-cv-06036-REL   Document 15   Filed 04/19/06   Page 19 of 47

any other problems."  The doctor observed that plaintiff was a "healthy appearing 47 year old white female in no acute distress at the time of exam."  The doctor assessed chronic cephalgia [headache], most likely tension cephalgia in origin; insomnia; and fibromyalgia.  Plaintiff's prescriptions for Ativan and Fiorinal were refilled, and the doctor recommended that plaintiff come back in six months.

On September 1, 2002, plaintiff called her doctor at North Town Medical Group complaining of allergies, watery and itchy eyes, and headaches for three weeks (Tr. at 133).  There is no assessment or treatment listed.

On September 5, 2002, plaintiff was seen at North Town Medical Group (Tr. at 133).  She complained of allergies.  The doctor noted she was in no apparent distress.  The doctor assessed seasonal allergies and diagnosed Clarinex, Nasonex, and Medrol Dosepak.

On October 11, 2002, plaintiff called North Town Medical Group and stated that she had a bladder infection (Tr. at 133, 184).  "[I]s helping to take care of grandkids, can't come in."  The doctor called in a prescription for plaintiff.

On November 30, 2002, plaintiff called North Town Medical Group and stated that she has fibromyalgia and is

20

currently having a flare up (Tr. at 133). "Takes Lorazepam
1 mg qd but today it seems to make her flare up worse and
it's making her more anxious. Taking Ibuprofen." The
doctor prescribed Flexeril, told her to discontinue
Lorazepam for now, and to continue Ibuprofen.

On January 22, 2003, plaintiff saw Steven Hendler,
M.D., at the request of Disability Determinations (Tr. at
149-152). Portions of Dr. Hendler's report read as follows:

> She was in her normal state of health until about six
> years ago. She developed disorientation and got lost
> in her neighborhood. She reports she developed
> depression and fatigue. She reports pain throughout her
> body and reports a longstanding history of headaches as
> well. . . .
>
> She reports the pain symptoms have progressed and she
> has difficulty working with her hands due to pain in
> the hands. She also has hip pain. She reports
> numbness and tingling in both arms from the elbows
> distally. . . .
>
> She has been treated with medications including Elavil
> and anti-depressants as well as Fiorinal, Lorazepam and
> Ambien. She has not participated in any physical
> therapy. . . .
>
> She is not currently working. She last worked about
> three years ago. . . .
>
> Weather changes and stress increase her symptoms.

Dr. Hendler performed a physical exam and found that
plaintiff had full range of motion in her neck, and 13 out
of 18 tender spots. She had negative straight leg raising

bilaterally, normal range of motion in her extremities and
back, normal gait and station with no assistive device used.
His impression was fibromyalgia.  "There are no objective
findings which preclude the patient from performing up to
six hours per day of standing and/or walking.  She probably
should not be performing heavy lifting (more than 20 pounds)
on a regular basis." (Tr. at 151).

On February 7, 2003, a non-examining medical source
statement was prepared by Timothy Link, M.D. (Tr. at 153).
He wrote, "With limited MER to support alleged severity, a
CE [consultative exam] was obtained.  It was the CE's
conclusion that light-level work would not be precluded.
This can be given significant weight."

On March 13, 2003, plaintiff was seen at North Town
Medical Group for increased stress and depression (Tr. at
180).  "She's had nightmares, she's crying a lot, she's not
sleeping well.  She doesn't have insurance at this time so
she couldn't afford the Zoloft. . . .  The Zoloft did work
but it was just too expensive.  She states that her daughter
just got married, she was the last to leave the home and she
states that she doesn't know if it is related to that but
she just finds that she's just severely depressed, crying
all the time, very emotional with mood swings."  The doctor

22

assessed depression with anxiety and prescribed Lexapro.
"In light of the fact that she doesn't have insurance I did
give her 70 sample tablets."

On April 2, 2003, plaintiff was seen at North Town
Medical Group for a following up of her depression (Tr. at
179). "She states she is doing much better. The Lexapro is
really helping. She states right now she is having a
fibromyalgia flare so she's a little tired, having a little
bit more pain but she's not having the crying spells or
depression at all. She is sleeping well. She is back to
only taking an Ativan once at bedtime and didn't have to
take it 2-3 x's/day because the Lexapro helped her so well.
Otherwise no complaints."

On June 16, 2003, plaintiff was seen at North Town
Medical Group to request refills on Ambien, Fiorinal and
Ativan (Tr. at 177-178). "Says she's been taking Fiorinal
about 3 a day for about 20 years. We did discuss the need to
wean her off of that. She could become addicted to all of
these medications. . . . I did tell her that long term
management with any of these medications was probably not
appropriate on a long term basis so, per Dr. Murray, we will
refill her meds for a month and then we will get her in to
see one of the internal med docs next month and they can

23

review her medications with her at that time. She was agreeable to this. She is without complaint today." The assessment was as follows: "This is a healthy 48 y/o female with fibromyalgia, chronic headaches, anxiety and depression. Her current medical regimen she says is controlling her symptoms well."

On July 21, 2003, plaintiff was seen at North Town Medical Group for a routine follow up (Tr. at 176). She "has a medical history that includes chronic daily tension headaches usually she wakes up with. She has a history of fibromyalgia, depression and anxiety. She reports that her symptoms have been fairly well controlled." Plaintiff reported that she is active, walking on a treadmill for 45 minutes each day.

On November 18, 2003, plaintiff was seen at North Town Medical Group for fibromyalgia (Tr. at 174). "She reports the fibromyalgia has been flared up for the past week to 10 days. Patient feels extremely fatigued with excess sweating, difficulty keeping herself up and awake. She does not report any fevers or chills, however, does have episodes of hot flashes. Her menstrual periods have been changing in quality and frequency. . . . The patient does not report any . . . back pain." Plaintiff appeared fatigued, she had

24

multiple trigger point tenderness consistent with fibromyalgia. The doctor increased her Lexapro, prescribed Prednisone for two weeks and prescribed Ritalin for two weeks. The doctor also ordered lab work. Her triglycerides were high at 344 (should be less than 150), her cholesterol was high at 274 (should be less than 200), her LDL cholesterol was high at 146 (should be less than 130), and her VLDL cholesterol was high at 69 (should be less than 30) (Tr. at 172). "Patient has high cholesterol/triglycerides - strict diet and exercise."

On December 22, 2003, plaintiff was seen at North Town Medical Group for a follow up (Tr. at 171). "She was last seen on the 18th of November for severe exacerbation of fibromyalgia. She was prescribed Ritalin 20 mg to be taken twice a day along with Lexapro that was increased to 20 mg once a day, on Prednisone 5 mg once a day for 2 weeks. Patient reports feeling much better with dramatic results with Ritalin. Patient is much more [illegible] and is able to lead a normal life without extreme fatigue and somnolence. . . . Her physical examination is essentially unremarkable. Patient is, however, obese." The doctor assessed fibromyalgia with fatigue, refilled her Ritalin, and recommended that she eat healthy foods and exercise on a

25

regular basis.

On April 8, 2004, plaintiff was seen at North Town Medical Group for fibromyalgia (Tr. at 170). "Patient also wondering about thyroid as she is fatigued and tired all the time." The doctor assessed fibromyalgia and prescribed Effexor. "Patient . . . is on the Effexor for fibromyalgia, not for pure depression. Instructed patient that the Effexor should help boost her energy and she was assured that she had normal thyroid studies 4 months ago and there's no indication to check these sooner."

*C.*    ***SUMMARY OF TESTIMONY***

During the June 14, 2004, hearing, plaintiff testified; her husband, Vincent Abbott, testified; and George Mcclellan, a vocational expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony.**

Plaintiff, age 49 at the hearing and now age 51, is five feet one and one-half inches tall and weighs 160 pounds (Tr. at 194). Plaintiff has a tenth-grade education (Tr. at 194). She later earned a GED and went to beauty school in 1971 and 1972 to become a licensed cosmetologist (Tr. at 195).

26

Plaintiff has been married for 34 years and has three grown children (Tr. at 196). Plaintiff has been taking Lortabs since 1984, she has been taking Proventil for ten years, she has been taking Effexor for depression since April 2004, and began taking Amitriptyline a few weeks before the administrative hearing (Tr. at 198, 199). She has no side effects from her medication (Tr. at 199).

Plaintiff was treated by a psychiatrist for about a year in 1997 (Tr. at 200). She was treated for attention deficit syndrome, but it actually was the early symptoms of fibromyalgia (Tr. at 200). She was trying to get to work and was getting lost in familiar neighborhoods (Tr. at 200). A rheumatologist, Dr. Ginder, diagnosed fibromyalgia in January 2000 (Tr. at 201). Plaintiff has been diagnosed with 12 trigger points, but her biggest problem is recurrent flares, fibro fog, and fatigue (Tr. at 202). Her latest flare was in November 2003 when she could not think, stay awake, or get out of bed (Tr. at 202). She has recurrent flares when she has problems with muscle pain and not being able to remember where anything is (Tr. at 202). These flares occur about once a month (Tr. at 202). The flares last about three to five days (Tr. at 202). These flares started in 1997 (Tr. at 204).

27

When plaintiff is not having a flare, she has general fatigue every day, trouble remembering, every day is a challenge to get up and get moving, and she has to take medication before she can get out of bed (Tr. at 204).

Plaintiff worked for about four weeks in 2003 at Cool Crest (Tr. at 205). She testified that no one wants to hire her because "they never know when I'm going to drop out with a flare." (Tr. at 205). Plaintiff was a gardener at Cool Crest, a miniature golf place owned by her daughter (Tr. at 205). Plaintiff planted flowers (Tr. at 205). She was unable to keep that job because of fibromyalgia (Tr. at 206).

From 1996 to 1999, she worked for The Jones Store in cosmetic sales (Tr. at 206). Plaintiff sold cosmetics at a counter and did stock work (Tr. at 206). She lifted from five to 20 pounds about twice a month (Tr. at 206-207). She stood all day (Tr. at 207, 208). Plaintiff quit that job (Tr. at 207). "Well, it just got increasingly difficult for me to get up and get to work and to maintain that work. I would have to leave. They were beginning to notice and bring up things that were happening at work and then we moved." (Tr. at 207). Before working at Jones, plaintiff worked at Halls for two years also selling cosmetics (Tr. at

28

207).  From 1995 until 1997, plaintiff worked at Zales
selling jewelry (Tr. at 208).  She stood all day at that job
(Tr. at 208).  Prior to that, she worked at a different
Jones Store and at a Dillards, both selling cosmetics (Tr.
at 209).  Plaintiff moved around at jobs because of
promotions or better opportunities (Tr. at 209).

Plaintiff could not perform those jobs now because she
cannot bend and stoop, which is required because things are
in cases or drawers beneath the cases (Tr. at 211).  Some
days she could do the ten- to 20-pound lifting, some days
she could not (Tr. at 211).  She could not stand all day
(Tr. at 212).

On a typical day, plaintiff will focus on one room of
her home that needs to be cleaned (Tr. at 212).  Her husband
does the laundry (Tr. at 212).  Plaintiff can dress and
clean herself (Tr. at 212).  She has a driver's license and
can drive to the grocery store and to visit her daughter
(Tr. at 196, 213).  Plaintiff has a treadmill and walks on
it just about every day, unless she is having a day when she
cannot get out of bed (Tr. at 213).  She walks on the
treadmill for about 15 minutes each day (Tr. at 213).  She
also does light gardening (Tr. at 214).  She can weed, pick
tomatoes, and water the garden (Tr. at 214).  Plaintiff

attends church every week, and the services are an hour long (Tr. at 215-216). Plaintiff makes crafts and sells them at craft shows once a month (Tr. at 216). She spends an hour or two during the day working on her crafts, and she spends about an hour at the shows (Tr. at 216-217, 228). Plaintiff sometimes takes her dogs for walks totaling about a half a mile (Tr. at 217). Plaintiff spends the rest of her day watching television (Tr. at 218).

Plaintiff goes to bed around 10:00 or 11:00 p.m. (Tr. at 218). She does not sleep well, but she sleeps about six or seven hours each night (Tr. at 219). About four days a week, she takes a nap during the day for one to two hours (Tr. at 219).

Plaintiff has headaches every morning, her back hurts constantly, her legs hurt, and her hands hurt (Tr. at 226). She takes Fioricet for her headache and lies in bed for about 30 minutes (Tr. at 226). Periodically during the day she will lie down and rest because she is exhausted (Tr. at 227).

Plaintiff's husband usually does the grocery shopping because he stops on his way home from work (Tr. at 220). Plaintiff goes grocery shopping by herself about once a month (Tr. at 220-221). Plaintiff helps carry in the

30

groceries (Tr. at 221).  Plaintiff does the dusting and
vacuuming (Tr. at 221).  Her husband does the laundry
because she has trouble pulling the clothes out of the
washer (Tr. at 221).  It hurts her hands to pick up wet
laundry (Tr. at 225).  Plaintiff can comfortably lift about
eight to ten pounds (Tr. at 221).  On a good day she can
lift 20 pounds, but on a bad day she is lucky to pick her
head up off the pillow (Tr. at 222).  Plaintiff can sit for
about an hour, she can stand for 15 minutes, she can walk
about a half a mile (Tr. at 222).  She can bend over and
pick up a pencil or pen if she drops it, she can reach over
her head to get a cup or glass off a shelf (Tr. at 222).
Sometimes plaintiff's hands give away and she drops things
(Tr. at 223).

       Plaintiff stated that she could do a job where she
could alternate sitting and standing, no lifting, with
normal breaks as long as she did not have to recall any
information (Tr. at 224).  If she was provided maps and
information on papers, she could do the job unless she was
"in a flare" (Tr. at 225).  Plaintiff said she would
probably need about three sick days per month (Tr. at 225).

## 2. Testimony of Vincent Abbott.

Vincent Abbott is plaintiff's husband (Tr. at 230). Plaintiff is worse than she stated in her testimony (Tr. at 230). Out of seven days, plaintiff stays in bed and cannot move three or four of those days (Tr. at 230). Mr. Abbott comes home from work and has to do quite a bit of work around the house because plaintiff cannot do it (Tr. at 230-231). Plaintiff is always in pain (Tr. at 231).

After grocery shopping, Mr. Abbott pretty much carries everything in (Tr. at 231). If she feels good, plaintiff can lift what she said she can, but 40 to 50 percent of the time, she really cannot do anything (Tr. at 231).

## 3. Vocational expert testimony.

Vocational expert George McClellan testified at the request of the Administrative Law Judge.

The vocational expert testified that plaintiff's work as a jewelry sales person and a cosmetics sales person both were light semiskilled jobs (Tr. at 234). Plaintiff also worked as a house cleaner, which is light unskilled work (Tr. at 234). Although plaintiff has a current cosmetology license, she never worked as a cosmetologist, but that job would be light skilled work (Tr. at 234).

32

The first hypothetical involved an individual who could stand or walk for six hours per day and could lift 20 pounds frequently (Tr. at 234-235). The vocational expert testified that such a person could perform the full range of light and sedentary work (Tr. at 235). There are 118,000 sedentary jobs in Missouri and 465,000 light jobs in Missouri (Tr. at 235). About ten percent of those jobs have a sit/stand option (Tr. at 235).

The second hypothetical involved a person who could lift eight to ten pounds frequently, 20 pounds on a good day, and less than eight pounds on a bad day; who could sit for one hour at a time and for a total of six hours per day; stand for 15 minutes at a time and for a total of two hours per day; walk one-half mile; bend most of the time but sometimes not; could reach most of the time, but sometimes not; with a grip that is OK some of the time but sometimes not (Tr. at 236). The vocational expert testified that such a person could perform the jobs of sedentary cashier, appointment clerk, security monitor, telemarketer, telecontact type jobs (Tr. at 236). These jobs all have a sit/stand option (Tr. at 236). The person could not lie down on the job, and the person could miss only about one day of work per month (Tr. at 236). Three sick days per

33

month would be excessive (Tr. at 236-237).

The next hypothetical involved a person who has a mild difficulty in maintaining social functioning and mild difficulty with regard to concentration, persistence, or pace (Tr. at 237). The vocational expert testified that these restrictions would not affect the person's ability to perform the above jobs (Tr. at 237).

The next hypothetical increased the mental restrictions to moderate rather than mild (Tr. at 237). The vocational expert testified that someone with moderate restrictions would not be able to work (Tr. at 237).

The vocational expert testified that whether plaintiff can work depends on how reliable she is with regard to her attendance (Tr. at 238).

On questioning by plaintiff's counsel, the vocational expert testified that a person who needs to lie down during the day and take a one- to two-hour nap would not be employable (Tr. at 238).

## V. FINDINGS OF THE ALJ

Administrative Law Judge William Zleit issued his opinion on August 11, 2004 (Tr. at 15-22). He found that plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 16). He found that

34

plaintiff suffers from fibromyalgia with chronic pain and headaches, a severe impairment (Tr. at 17). He found that plaintiff's depression is not a severe impairment (Tr. at 17). Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 17).

The ALJ found plaintiff not entirely credible, and gave little weight to the testimony of plaintiff's husband (Tr. at 18-19). He found that plaintiff has the residual functional capacity to perform light or sedentary jobs with a sit/stand option (Tr. at 19). With this residual functional capacity, plaintiff cannot return to her past relevant work (Tr. at 19). However, she can perform light or sedentary jobs with a sit/stand option, and there are 11,800 sedentary jobs and 46,500 light jobs with a sit/stand option in the state of Missouri (Tr. at 20).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are

35

inconsistencies in the record as a whole, the ALJ may
discount subjective complaints.  Gray v. Apfel, 192 F.3d
799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301,
303 (8th Cir. 1993).  The ALJ, however, must make express
credibility determinations and set forth the inconsistencies
which led to his or her conclusions.  Hall v. Chater, 62
F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956
F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly
discredits testimony and gives legally sufficient reasons
for doing so, the court will defer to the ALJ's judgment
unless it is not supported by substantial evidence on the
record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to
discredit plaintiff's subjective complaints is supported by
substantial evidence.  Subjective complaints may not be
evaluated solely on the basis of objective medical evidence
or personal observations by the ALJ.  In determining
credibility, consideration must be given to all relevant
factors, including plaintiff's prior work record and
observations by third parties and treating and examining
physicians relating to such matters as plaintiff's daily
activities; the duration, frequency, and intensity of the
symptoms; precipitating and aggravating factors; dosage,

36

effectiveness, and side effects of medication; and functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the <u>Polaski</u> opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The claimant testified that her fibromyalgia is debilitating and prevents her from working on a regular basis. The claimant testified that her ability to lift, carry, sit, stand, walk, bend, and grip are all limited. The claimant testified that she continues to have fibromyalgia exacerbations, which are debilitating. The claimant testified that she would probably miss work at least three times a month and could not work on a regular basis.
>
> The medical evidence and clinical findings in this case reflect that the claimant is limited by her condition; however, no doctor of record indicated that the claimant's condition is completely debilitating. Moreover, no doctor of record opined that the claimant's condition would cause her to miss work three times a month. Instead, the medical opinions and assessments of record reflect that the claimant is relatively capable and that her condition has been relatively stable with medication. As noted above, examinations of the claimant has [sic] not shown her to be complaining about the severity of limitation she now alleges at hearing. In addition, examinations of the claimant have shown her to be at least capable of sedentary to light work during the pertinent period in this case.
>
> Further weakening the claimant's contention of complete disability is [sic] the claimant's various activities.

37

The claimant testified that she could perform some
household chores as well as some light gardening.  The
claimant testified that she is able to water and weed
her garden on a regular basis.  She also testified that
she is able to attend church, walk her two dogs about
half a mile, and exercise on a treadmill fifteen
minutes a day.  Additionally, the claimant testified
that she maintains a craft booth for 20 dollars a
month. The claimant testified that she attends the
booth monthly and tries to sell crafts she has made for
about an hour.  The claimant testified that she barely
breaks even with the business; however, her activities
are incongruent with her contention of completed [sic]
disability.  Moreover, all the claimant's above-cited
activities, although not very strenuous, undermine her
claim of complete disability.  The claimant also has a
sporadic work history with typically low earns [sic],
which is not indicative of an individual with strong
motivation to work.

(Tr. at 18-19).

## 1. PRIOR WORK RECORD

The ALJ noted that plaintiff had a sporadic work
history with typically low earnings "which is not indicative
of an individual with strong motivation to work."  Out of 34
years listed in her employment history, plaintiff had no
earned income during 18 of those years.  One year her earned
income was $18.75, and another year her earned income was
$34.65.

Although plaintiff had many years when she did not
work, she had significant earnings during the years just
prior to her alleged onset date. Therefore, although the ALJ
was entitled to rely on plaintiff's sporadic work history

38

and typically low earnings, the fact that her highest earnings were just before her alleged onset date gives this factor less weight toward finding plaintiff not credible.

## 2.   *DAILY ACTIVITIES*

The ALJ noted that plaintiff can walk on her treadmill, do gardening, maintain a craft booth once a month, attend church regularly, walk her two dogs, and do household chores, and found that these activities are inconsistent with total disability.

On April 20, 1999, plaintiff told her doctor that she does try to exercise.  On July 20, 1999, she told her doctor that she was doing exercise in the form of aerobics daily and Taebo two to three times per week. On January 12, 2000, plaintiff told Dr. Ginder that she babysits for her one-year-old grandson.  On October 3, 2002, plaintiff said she walks as much as possible, which is up to two miles on some days.  On November 10, 2000, she told her doctor that she was exercising, doing aerobics 40 minutes two times per week as well as doing yoga.  On June 18, 2001, she told her doctor she had been doing a lot of gardening and moving rocks.  On October 11, 2002, plaintiff called her doctor for a prescription. She said she was helping to take care of her grandchildren and therefore was unable to go to the doctor's

39

office.  On July 21, 2003, plaintiff told her doctor that she is active, walking on a treadmill for 45 minutes each day.  On December 22, 2003, plaintiff told her doctor that with her medication, she is able to lead a normal life without extreme fatigue and drowsiness.  Plaintiff testified during the hearing that she has a treadmill and tries to walk on it every day.  She spends an hour or two during the day working on her crafts, she walks her dogs, she cleans a room of her house, she does grocery shopping, she dusts, she vacuums, she drives, she does dishes, she takes care of herself, she pulls weeds, she waters her garden, she picks vegetables, and she attends one-hour church services every week.

These daily activities are inconsistent with complete disability.

### 3.   *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

On July 20, 1999, plaintiff told her doctor that overall she was doing fine.  On October 5, 1999, her doctor noted that her affect was good and her insight was good.  On January 12, 2000, she told Dr. Ginder that she had suffered with chronic headaches for 20 years, which includes the years of plaintiff's highest earnings.  This indicates that plaintiff's symptoms are not disabling, as she was able to

40

work with those symptoms for years.

On March 22, 2001, plaintiff told her doctor that overall she had been in fairly good health. On March 25, 2002, plaintiff saw the doctor for a medication check and overall she denied any other problems. On August 19, 2002, plaintiff told her doctor she was doing better. "She goes to a chiropractor for adjustments of her low back. She denies any other problems." On April 2, 2003, plaintiff told her doctor that she was currently having a "fibromyalgia flare so she's a little tired, having a little bit more pain but she's not having the crying spells or depression at all. She is sleeping well." These symptoms of a fibromyalgia flare are not disabling. During that visit, she had no other complaints.

On June 16, 2003, plaintiff visited her doctor for medication refills. "She is without complaint today." On July 21, 2003, she told her doctor that her symptoms had been fairly well controlled.

Plaintiff worked and earned substantial income while she had chronic headaches. Her description of her fibromyalgia flares to her doctor is inconsistent with her description of those flares during the administrative hearing. The duration, frequency, and intensity of

41

plaintiff's symptoms do not support a finding of complete disability.

## 4. *PRECIPITATING AND AGGRAVATING FACTORS*

There is little evidence of precipitating and aggravating factors in the record. On April 1, 2002, plaintiff told her doctor that her 25 to 30 pound grandson fell on her lower back, and she was unable to sit or lie down. Those symptoms were not mentioned during any other doctor visit, so the record supports an assumption that her symptoms were a one-time thing, as a result of her grandson's falling on her.

On January 22, 2003, plaintiff told Dr. Hendler that weather changes and stress increase her symptoms. However, there is no description of what symptoms are increased or to what extent. Dr. Hendler was a consulting doctor referred by Disability Determinations. Plaintiff never told any of her treating physicians that weather increased her symptoms.

## 5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

The record establishes that when plaintiff takes her medication as prescribed, her symptoms are well controlled.

On September 30, 1999, plaintiff saw her doctor and reported that the night before, she went to the emergency room because of a headache. "She normally takes Fiorinal

42

for her headache and she has been out." On October 25, 1999, she told her doctor that she was on Prozac 20 mg several years ago for about three years in a row and she did well on this. On March 13, 2003, plaintiff told her doctor she had been having nightmares, crying a lot, and not sleeping well. "She doesn't have insurance at this time so she couldn't afford the Zoloft. . . . The Zoloft did work but it was just too expensive." Plaintiff was given Zoloft samples.

On April 7, 2003, plaintiff told her doctor she was doing much better and that Lexapro was really helping. "She is back to only taking an Ativan once at bedtime and didn't have to take it 2-3 x's/day because the Lexapro helped her so well." On June 16, 2003, plaintiff told her doctor that her current medical regimen was controlling her symptoms well. On July 21, 2003, she told her doctor that her symptoms have been fairly well controlled. On December 22, 2003, plaintiff reported that she felt much better with dramatic results with Ritalin. Plaintiff said she was able to lead a normal life without extreme fatigue and drowsiness. Plaintiff testified during the hearing that she has no side effects from her medication.

43

This factor supports the ALJ's finding that plaintiff's testimony is not credible.

**6. *FUNCTIONAL RESTRICTIONS***

Plaintiff's doctors have not restricted her physical activities. In fact, her doctors have consistently recommended that she exercise more.

On April 20, 1999, plaintiff's doctor told her to increase her exercise. On July 20, 1999, plaintiff was doing aerobics daily and Taebo two to three times per week. Her doctor "[h]ighly advised patient that she needs to keep up the good work with increased exercise." On January 20, 2000, Dr. Ginder told plaintiff to resume exercise and offered to refer plaintiff for physical therapy to help her exercise. On June 27, 2000, plaintiff's doctor wrote, "[H]ighly encouraged to increase exercise." On November 10, 2000, plaintiff was doing aerobics for 40 minutes twice a week as well as yoga. Her doctor "[a]dvised [her] to keep up the good work with increase in exercise." On December 17, 2001, her doctor stated that plaintiff needed to start exercising three to four times per week. On November 18, 2003, plaintiff's doctor told her to exercise. On November 22, 2003, plaintiff's doctor recommended that she exercise on a regular basis.

44

On January 20, 2000, Dr. Ginder found no restriction in range of motion in her peripheral joints. On January 22, 2003, Dr. Hendler found that plaintiff had full range of motion in her neck, negative straight leg raising bilaterally, normal range of motion in her extremities and back, normal gait and station with no assistive device used. "There are no objective findings which preclude the patient from performing up to six hours per day of standing and/or walking. She probably should not be performing heavy lifting (more than 20 pounds) on a regular basis." On February 7, 2003, Dr. Link agreed that plaintiff could perform light level work. On December 22, 2003, plaintiff's doctor noted that her physical exam was essentially unremarkable.

Finally, plaintiff testified that the hearing that she could do a job where she could alternate sitting and standing, no lifting, with normal breaks as long as she did not have to recall any information, was provided maps and information on papers, and unless she was "in a flare." As mentioned above, plaintiff's fibromyalgia flares, as described by her to her doctor, are not as severe as she stated during the hearing.

45

I find that this factor supports the ALJ's finding that plaintiff's testimony is not entirely credible.

**B.   *CREDIBILITY CONCLUSION***

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's testimony is not entirely credible. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

**VII. *TESTIMONY OF VOCATIONAL EXPERT***

Plaintiff next argues that the testimony of the vocational expert is not supported by substantial evidence because the hypothetical did not include the need to rest throughout the day, take naps in the afternoon three to four days per week, and miss work three days per month.

A proper hypothetical question must set forth all of a claimant's disabilities, but need not include limitations found by the ALJ to be not credible.  Davis v. Shalala, 31 F.3d 753, 755-56 (8th Cir. 1994); Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).  The limitations plaintiff argues were improperly omitted from the hypothetical were found not credible, and I find that the substantial evidence in the record supports that finding.  Therefore, because the hypothetical relied upon by the ALJ included all of

46

plaintiff's credible limitations, the vocational expert's testimony was supported by substantial evidence.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's determination that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.

_____/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
April 19, 2006

47